# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SUKHBIR SINGH TOOR**, *et al.*,

      *Plaintiffs*,

  v.

**DAVID H. BERGER**, *et al.*,

      *Defendants*.

Civil Action No. 1:22-cv-01004

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION ON BEHALF OF PLAINTIFFS MILAAP SINGH CHAHAL, AEKASH SINGH, AND JASKIRAT SINGH**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................3

STANDARD FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF ..............................19

ARGUMENT ...........................................................................................................................19

   I.   Plaintiffs are likely to succeed on their RFRA claims. ...................................................20

       A.  Plaintiffs are sincerely compelled by their Sikh faith to wear beards, unshorn hair, turbans, and other religious articles as a sign of devotion to God. ..............................................................................................................21

       B.  The Marine Corps' refusal to accommodate Plaintiffs' religious practices imposes a substantial burden on their religious exercise. ............................22

       C.  The Marine Corps has no compelling interest in forcing Plaintiffs to forgo their religious practice to commence serving their country. ..................................................................................................23

       D.  Even if the Marine Corps did have a compelling interest here, forcing Plaintiffs to violate their faith is not the least restrictive means of furthering that interest. ............................................................29

   II.  Plaintiffs are likely to succeed on their Free Exercise Clause claims. ...............................32

  III.  Plaintiffs are likely to succeed on their Equal Protection claims. .....................................34

  IV.  The remaining factors each weigh in favor of granting preliminary injunctive relief. ...............................................................................................35

       A.  Plaintiffs will suffer irreparable harm absent injunctive relief. ...................36

       B.  The balance of harms and public interest weigh in Plaintiffs' favor. ..........37

   V.  The Court should not require security. ..........................................................................39

CONCLUSION.........................................................................................................................40

CERTIFICATE OF SERVICE .................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014) ...............................................................................22

*Banner v. United States*,
428 F.3d 303 (D.C. Cir. 2005) ...............................................................................34

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
611 F.3d 248 (5th Cir. 2010) .................................................................................21

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ..........................................................................................34, 35

*Bonnette v. D.C. Court of Appeals*,
796 F. Supp. 2d 164 (D.D.C. 2011) .......................................................................37

*BST Holdings, L.L.C. v. Occupational Safety and Health Admin.*,
17 F.4th 604 (5th Cir. 2021) ..................................................................................25

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ...............................................................................................24

*Capitol Hill Baptist Church v. Bowser*,
496 F. Supp. 3d 284 (D.D.C. 2020) ....................................................... 22, 36, 39-40

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ...............................................................................36

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ...........................................................................24, 25, 32, 33

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ................................................................................................23

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ................................................................................................34

*Di Liscia v. Austin*,
No. 21-1047 (D.D.C. Apr. 15, 2021) ........................................................................1

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................36

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990)..................................................................................33

*Fraternal Ord. of Police v. Newark*,
    170 F.3d 359 (3d Cir. 1999) ..............................................................25-26, 35

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021)......................................................24-25, 26, 32, 33

*Gonzales v. O Centro Espirita Beneficente Uniao*,
    546 U.S. 418 (2006)......................................................................... *passim*

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...............................................................38

*Harbin-Bey v. Rutter*,
    420 F.3d 571 (6th Cir. 2005) .................................................................34

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .............................................................26

*Holt v. Hobbs*,
    574 U.S. 352 (2015)......................................................................... *passim*

*Johnson v. Robison*,
    415 U.S. 361 (1974)..............................................................................34

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008) ...............................................................22

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ...............................................................37

*Katcoff v. Marsh*,
    755 F.2d 223 (2d Cir. 1985)...................................................................28

*Kay v. Bemis*,
    500 F.3d 1214 (10th Cir. 2007) .............................................................21

*Kennedy v. District of Columbia*,
    654 A.2d 847 (D.C. Cir. 1994) ..............................................................26

*King's Garden, Inc. v. FCC*,
    498 F.2d 51 (D.C. Cir. 1974)..................................................................35

*Laster v. District of Columbia*,
    439 F. Supp. 2d 93 (D.D.C. 2006) .........................................................39

*Liberty Coins, LLC v. Goodman*,
   748 F.3d 682 (6th Cir. 2014) ........................................................................35

*McAllen Grace Brethren Church v. Salazar*,
   764 F.3d 465 (5th Cir. 2014) ...................................................................25, 30

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) .....................................................................36

*Moussazadeh v. Tex. Dep't of Crim. Just.*,
   703 F.3d 781 (5th Cir. 2012) ..........................................................................21

*Niemotko v. Maryland*,
   340 U.S. 268 (1951).........................................................................................34

*Nken v. Holder*,
   556 U.S. 418 (2009).........................................................................................37

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992).............................................................................................34

*O Centro v. Ashcroft*,
   389 F.3d 973 (10th Cir. 2004) .........................................................................38

*Pursuing American Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016)........................................................................35

*Potter v. District of Columbia*,
   558 F.3d 542 (D.C. Cir. 2009)........................................................................26

*Rich v. Sec'y, Fla. Dep't of Corr.*,
   716 F.3d 525 (11th Cir. 2013) .........................................................................24

*Rigdon v. Perry*,
   962 F. Supp. 150 (D.D.C. 1997)................................................................20, 36

*Roman Catholic Archbishop of Wash. v. Bowser*,
   531 F. Supp. 3d 22 (D.D.C. 2021)...............................................22, 35, 36, 38

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020).................................................................................24, 36

*Sherbert v. Verner*,
   374 U.S. 398 (1963).........................................................................................22

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ........................................................................19

*Simms v. District of Columbia.*,
    872 F. Supp. 2d 90 (D.D.C. 2012) .......................................................36

*Singh v. Carter*,
    168 F. Supp. 3d 216 (D.D.C. 2016) ........................................... *passim*

*Singh v. McHugh*,
    185 F. Supp. 3d 201 (D.D.C. 2016) ........................................... *passim*

*Solantic, LLC v. City of Neptune Beach*,
    410 F.3d 1250 (11th Cir. 2005) ...........................................................24

*Srail v. Village of Lisle*,
    588 F.3d 940 (7th Cir. 2009) ...............................................................34

*Tagore v. United States*,
    735 F.3d 324 (5th Cir. 2013) ...............................................................24

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ..................................................................32, 33

*Thomas v. Rev. Bd.*,
    450 U.S. 707 (1981) ..............................................................................22

*Tyndale House Publishers v. Sebelius*,
    904 F. Supp. 2d 106 (D.D.C. 2012) .....................................................38

*United States v. Batchelder*,
    442 U.S. 114 (1979) ..............................................................................35

*United States v. Sterling*,
    75 M.J. 407 (C.A.A.F. 2016) ...............................................................20

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................19

**Statutes and Rules**

10 U.S.C. § 774 ................................................................................6, 12

42 U.S.C. § 2000bb-1 ...........................................................12, 20, 23

42 U.S.C. § 2000bb-2 ........................................................................20

Fed. R. Civ. P. 65 ..............................................................................39

**Other Authorities**

*2020 Demographics: Profile of the Military Community*, Department of Defense......................18

Army Directive 2017-03 (Policy for Brigade-Level Approval of Certain Requests
    for Religious Accommodation) (Jan. 3, 2017).............................................................6

Army Directive 2018-19 (Nov. 8, 2018) .............................................................17, 23

Army Dress Manual, The Australian Army, Effective Dec. 20, 2019............................22

Philip Athey, *Corps' Sergeant Major Calls for Improved Treatment, Care of
    Junior Marines,* Marine Corps Times (Aug. 9, 2021) ............................................19

Philip Athey, *Here's Where Ponytails Stand for Women in the Marine Corps*,
    Marine Corps Times (Nov. 4, 2021).....................................................................17

*The Commander's Handbook for Religious Military Support*, U.S. Marine Corps,
    MRCP 3-30D.4 ............................................................................................ 28-29

Defense Instruction 1300.17 (1988) (amended Jan. 2014 and Sept. 2020) ...................6

Army Regulation 600-20 (2009)..................................................................................6

Carlos Del Toro, *One Navy-Marine Corps Team: Strategic Guidance From The
    Secretary of the Navy* (Oct. 2021)................................................................ 17-18

Sir Charles Gough & Arthur Donald Innes, *The Sikhs and the Sikh Wars* (1897) .........5

Christopher Guly, *Defense Minister Harjit Singh Sajjan: A Sikh Soldier's Climb
    to the Canadian Cabinet*, L.A. Times (Feb. 22, 2016, 3:30 AM).............................6

*The Global Religious Landscape: A Report on the Size and Distribution of the
    World's Major Religious Groups as of 2010*, The Pew Forum on Religion and
    Public Life (2012) ..................................................................................................4

Shareda Hosein, *Muslims in the U.S. Military: Moral Injury and Eroding Rights*,
    Pastoral Psychology, 68: 77-92 (Nov. 12, 2018)....................................................39

*Introduction to Sikhism*, 1 Religious Organizations and the Law § 1:23 (2d ed.)........22

Rajdeep Singh Jolly, *The Application of the Religious Freedom Restoration Act to
    Appearance Regulations that Presumptively Prohibit Observant Sikh Lawyers
    from Joining the U.S. Army Judge Advocate General Corps*,
    11 Chap. L. Rev. 155 (2007)..................................................................................5

Joseph Lacdan, *For Massachusetts Soldier, Path to Military Service Was a
    Spiritual One*, U.S. Army News (Sept. 24, 2020)..................................................28

Arvind-Pal Singh Mandair, *Sikhism: A Guide for the Perplexed* (2013) .......................................5

National Defense Authorization Act for Fiscal Year 2020, H.R. 2500,
116th Cong. § 530B (2019) ...........................................................................................39

Oriana Pawlyk, *Air Force Special Operations Approves First Beard,
Turban Waiver for Sikh Airman*, Military.com (July 30, 2020) .............................................17

LtGen David Ottignon & BGen Jason Woodworth, *Diversity, Equity & Inclusion:
Why This is Important to the Corps as a Warfighting Organization*,
Marine Corps Gazette (July 2021).................................................................................38, 39

Dave Philipps, *The Marines Reluctantly Let a Sikh Officer Wear a Turban.
He Says It's Not Enough,* N.Y. Times (Sept. 26, 2021) .....................................................6, 16

*Pseuodfolliculitis Barbae*, American Osteopathic College of Dermatology ..............................18

Secretary of the Air Force, Air Force Instruction 36-2903, Dress and Personal
Appearance of Air Force Personnel (Feb. 7, 2020) ......................................................7, 17, 31

Secretary of the Air Force, Air Force Policy Directive 52-2, Accommodation of
Religious Practices in the Air Force (July 28, 2020) ...............................................................7

Secretary of the Air Force, Department of the Air Force Instruction 52-201,
Religious Freedom in the Department of the Air Force (June 23, 2021) ................................7

*Sikhism*, WorldAtlas (Nov. 4, 2021)..........................................................................................4

*Sikhs Prove Their Valor; Twenty-one Men Hold Sarhargarti Police Post Against
1,000 Orakzais Over Six Hours*, N.Y. Times (Sept. 14, 1897)..............................................6

*Statement for the Record of the Sikh Coalition,* House Armed Services Committee
Hearing on Religious Accommodations in the Armed Services
(Sept. 19, 2014).............................................................................................................6

*Updated Uniform Regulations per MARADMIN 134/22*, Facebook
(Mar. 23, 2022) .............................................................................................................19

Geoff Ziezulewicz, *How the Navy's Beard Policy Discriminates Against Black
Sailors*, Navy Times (Apr. 5, 2022).............................................................................18

**INTRODUCTION**

Members of the U.S. military should not have to choose between serving their God and serving their country. Yet Plaintiffs Milaap Singh Chahal, Aekash Singh, and Jaskirat Singh now face that coercive choice. All three meet the qualifications to be admitted into the United States Marine Corps with only one remaining obstacle: an order demanding that they abandon their core religious practices upon entering, and for the duration of, their basic training.

As devout Sikhs, Plaintiffs are obligated to maintain unshorn hair, including beards, and other religious articles. Consistent with Marine Corps policy, they have sought religious accommodations that would allow them to remain true to their faith while in service to their nation—accommodations that are already permitted by both the United States Army and United States Air Force, as well as by militaries around the world. The Marine Corps, in contrast, has insisted that Plaintiffs' religious expression and articles of faith violate a standard of "uniformity" ostensibly required of all Marines during recruit training. It has thus denied their requests for religious accommodations during this initial phase of their service, barring them from serving at all as a result.[1] Forcing Plaintiffs to choose between serving their God and their country contradicts the Marine Corps' own regulations, the Religious Freedom Restoration Act (RFRA), and the United States Constitution. This Court has previously granted related emergency relief to servicemembers in the Navy, *Di Liscia v. Austin,* No. 21-1047 (D.D.C. Apr. 15, 2021), ECF No. 7 at 1 (granting "stay enjoining Defendants from forcing Di Liscia to shave his beard"), and in the Army, *Singh v. Carter*, 168 F. Supp. 3d 216, 229 (D.D.C. 2016) (issuing TRO against discriminatory testing of a Sikh soldier concerning his religious beard). And the Army and Air

---

[1] The Marine Corps has also denied the accommodation of Plaintiff Milaap Singh Chahal to the extent he may serve in a ceremonial role. And it has denied the accommodation of all Plaintiffs to the extent they may be deployed and entitled to receive "hostile fire" or "imminent danger" pay. While these limitations are also challenged in the Complaint, for purposes of this preliminary injunction motion, Plaintiffs address only the limitation on their accommodations during their basic training, which prevents them from entering the Marine Corps. Plaintiff Sukhbir Toor has already completed basic training. Thus, throughout this brief "Plaintiffs" refers only to Plaintiffs Milaap Singh Chahal, Aekash Singh, and Jaskirat Singh.

Force have since allowed accommodations for Sikhs across the board, including during recruit training. Because the Marine Corps has no compelling reason for continuing to restrict Plaintiffs' religious exercise, Plaintiffs now seek a preliminary injunction preventing the Marine Corps from enforcing its uniform and grooming policy as to their religious articles of faith.

Plaintiffs' articles of faith would not hinder the performance of their duties in any way. Moreover, the fact that the Marine Corps is *more* restrictive of religious practice during recruit training (where no external threats are present) than during a Marine's actual service underscores that its real concern is one of uniformity, not safety. This interest in uniformity has little force as applied to Plaintiffs' religious exercise, particularly considering the many other exceptions to uniformity the Marine Corps *invites* to diversify its ranks.



*U.S. Army Corporal Simran Preet Singh Lamba carrying the guidon for his platoon during Basic Combat Training* graduation. *Photo Credit: Susanne Kappler/U.S. Army*



*Marine Corps special-operations staff sergeant in Afghanistan Photo Credit: Michael M. Phillips/The Wall Street Journal*

Because the Marine Corps has no compelling reason to suppress Plaintiffs' religious exercise, Plaintiffs are likely to prevail on the merits of their RFRA, Free Exercise, and Equal Protection claims. The other injunction factors weigh in their favor too. Absent relief, Plaintiffs will continue suffering irreparable harm, facing a coercive choice to abandon either their religious beliefs or the ability to serve their country as Marines. All three Plaintiffs have put their lives and careers on hold, and two have waited over a year for the Marine Corps to process their requests. All of them have passed the requisite exams and fitness tests to qualify for a contract with the Marine Corps,

2

but these qualifying tests will soon expire. The Marine Corps allows recruits who are deemed qualified but who are not ready to commit to becoming a Marine to maintain their test scores for only up to two years. Candidates who are ready to make the commitment, but who cannot immediately embark for recruit training, enter into a Delayed Entry Program (DEP), which allows their qualifications to remain active for up to only 365 days.

While all three pre-accession Plaintiffs were ready to commit to becoming Marines, due to inconsistencies within the Marine Corps' own policies, two were prohibited from entering the DEP while their religious accommodations were pending while the third Plaintiff, Jaskirat Singh, was permitted to enter the DEP. On April 30, 2022, Plaintiff Jaskirat Singh's DEP contract will expire, and he will have to be administratively discharged and start the enlistment process over again absent relief from this Court. Additionally, given the extensively long time the Marine Corps has taken to respond to Plaintiffs' requests, and looming deadlines for both Plaintiffs Milaap Singh Chahal and Aekash Singh, they will both have to retake their mental and physical entrance tests and start the accommodation process all over again unless this Court intervenes.

The Marine Corps' asserted interests would not be compromised by allowing Plaintiffs to maintain their beards and religious articles. And relief would be in the public's interest, as it would affirm the core rights of religious exercise and expression guaranteed by federal law and the U.S. Constitution while supporting the Marine Corps' own commitment to the diversity of our servicemembers. The Court should issue a preliminary injunction enjoining the Marine Corps from forcing Plaintiffs to abandon their faith during recruit training and the pendency of this lawsuit.

## BACKGROUND

### The Sikh Faith

Sikhism is a monotheistic religion that originated in the fifteenth century in the Punjab region of South Asia. While relatively young compared to other major world religions, it is the world's

fifth largest faith tradition with nearly 25 million adherents.[2] There are approximately 700,000 Sikhs in the United States.[3] The Sikh faith teaches that God is all loving, all pervading, and eternal. Compl. ¶ 76. This God of love is accessed through grace and sought by service to mankind. *Id.* The founder of Sikhism, Guru Nanak, rejected the caste system and declared all human beings, including women, to be equal in rights, responsibilities, and ability to reach God. Compl. ¶ 77. He taught that God was universal to all—not limited to any religion, nation, race, color, or gender. *Id*.

Consistent with the teachings of the Sikh gurus, Sikhs wear external articles of faith to bind them to the beliefs of the religion. Compl. ¶ 78. Unlike some other faiths, where only clergy maintain religious articles on their person, all Sikhs are required to wear external articles of faith. *Id.* These articles of faith, such as unshorn hair (*kesh*) and the turban, distinguish a Sikh and have deep spiritual significance. Compl. ¶ 79. A Sikh's other religious articles include the *kanga* (small wooden comb) worn in the hair; the *kara* (steel bracelet) worn on the wrist; the *kacchera* (undershorts) worn under the clothes; and a sheathed *kirpan* that is carried on the person (emblem of justice resembling a small knife). *Id.*

Along with millions of other Sikhs, Plaintiffs sincerely believe that maintaining unshorn hair (including facial hair) is an essential part of the Sikh way of life. Compl. ¶ 80. Guru Nanak started the practice, regarding it as living in harmony with God's will. Compl. ¶ 81. The Sikh Code of Conduct, called the *Rehat Maryada*, outlines the requirements for practicing the Sikh way of life. All Sikhs must follow the guidelines set forth in this document. *Id*. The *Rehat Maryada* explicitly instructs that if you are a Sikh, you must "[h]ave, on your person, all the time . . . the *Keshas* (unshorn hair)." Compl. ¶ 82. This document prohibits the removal of hair from the body as one of four major taboos. One of the other taboos on this list is adultery. *Id.* Accordingly, the fact that cutting one's hair is a moral transgression as serious as committing adultery speaks to the immense

---

[2]   *See The Global Religious Landscape: A Report on the Size and Distribution of the World's Major Religious Groups as of 2010*, The Pew Forum on Religion and Public Life, 9 n.1 (2012), https://perma.cc/L9L7-S6JA.

[3]   *Sikhism*, WorldAtlas (Nov. 4, 2021), https://perma.cc/A3FZ-LLFE.

significance of uncut hair in the Sikh religion. *Id*. The *Rehat Maryada* also mandates that Sikhs wear a turban which must always cover a Sikh's head. Compl. ¶ 83. The turban reminds a Sikh of his duty to maintain and uphold the core beliefs of the Sikh faith, which include working hard and honestly, sharing with the needy, and promoting equality and justice for all. *Id.* When a Sikh ties a turban, the turban ceases to be simply a piece of cloth and becomes one and the same with the Sikh's head. *Id*. Historically, uncut hair and turbans have been central features of the Sikh identity. Compl. ¶ 84. For example, in the eighteenth century, Sikhs in South Asia were persecuted and forced to convert from their religion by the dominant leaders in the region. *Id.* The method of forcing conversions was to remove a Sikh's turban and cut off his hair. *Id*. As resistance to such forced conversions, many Sikhs chose death over having their turbans removed and hair shorn. Compl. ¶ 85. Since then, denying a Sikh the right to wear a turban and maintain unshorn hair has symbolized denying that person the right to belong to the Sikh faith, and is perceived as the most humiliating and hurtful physical injury that can be inflicted upon a Sikh. Compl. ¶ 86.

The History of Sikh Service in the Military

Service in the armed forces has long been—and continues to be—a central part of the Sikh tradition. This tradition dates back to Guru Gobind Singh's creation of the Khalsa, a spiritual order and army comprised of initiated Sikhs, to resist persecution by the Mughal Empire in the late seventeenth century. The Khalsa warrior-saint paradigm instructs Sikhs to take up arms against oppression as a religious duty.[4] After Britain expanded its control of India, Sikh soldiers soon became "among the sturdiest and trustiest men of the British army," with a group of twenty-one Sikhs famously repulsing an attack by thousands of Afghans for six hours at the Battle of Saragarhi in 1897, and with approximately 100,000 Sikhs— a disproportionately high number among Indian volunteer soldiers—fighting for the British in World War I.[5] Observant Sikhs still serve with their

---

[4]   Sir Charles Gough & Arthur Donald Innes, *The Sikhs and the Sikh Wars*, 18-21 (1897); Arvind-Pal Singh Mandair, *Sikhism: A Guide for the Perplexed*, 4, 55 (2013).

[5]   *See* Rajdeep Singh Jolly, *The Application of the Religious Freedom Restoration Act to Appearance Regulations that Presumptively Prohibit Observant Sikh Lawyers from Joining the*

articles of faith intact in militaries in Canada, Australia, the United Kingdom, and India, and also as United Nations Peacekeepers, often working closely with American troops in troubled regions.[6] In fact, Canada's former Minister of National Defence and current Minister of International Development, Lieutenant Colonel Harjit Sajjan, is an observant Sikh, who supported the U.S.-led coalition in Afghanistan and served as a special advisor to U.S. Army Lieutenant General James Terry, commander of the 10th Mountain Division, with his religious articles of faith intact.[7]

As members of the "greatest generation," Sikhs proudly served in the U.S Army with all of their articles of faith during both World Wars and the Vietnam War, until the military changed its policy in 1981 to prohibit exemptions to the uniform requirements for visible articles of faith. While Congress subsequently enacted a statute protecting soldiers' right to wear religious apparel that is "neat and conservative" and would not "interfere with . . . military duties," 10 U.S.C. § 774(b), the statute did not address religious beliefs against cutting hair and was construed narrowly by the military to continue barring turban-wearing Sikhs from serving.[8] And although some Sikhs already in the Army were grandfathered in, the 1981 policy change precluded any other practicing Sikhs from entering the U.S. Armed Forces for nearly thirty years. In 2017 and 2020, the Army and Air Force revised their policies respectively, such that over 100 Sikhs currently serve with courage and distinction in those branches.[9] But the Marine Corps continues

---

*U.S. Army Judge Advocate General Corps*, 11 Chap. L. Rev. 155, 157 (2007); *Sikhs Prove Their Valor; Twenty-one Men Hold Sarhargarti Police Post Against 1,000 Orakzais Over Six Hours*, N.Y. Times (Sept. 14, 1897).

[6]   *Statement for the Record of the Sikh Coalition,* House Armed Services Committee Hearing on Religious Accommodations in the Armed Services (Sept. 19, 2014), https://perma.cc/DCS7-A8PR.

[7]   *See* Christopher Guly, *Defense Minister Harjit Singh Sajjan: A Sikh Soldier's Climb to the Canadian Cabinet*, L.A. Times (Feb. 22, 2016, 3:30 AM), https://perma.cc/8KBL-VHXM.

[8]   *See* Defense Instr. 1300.17 (1988) (amended Jan. 2014 and Sept. 2020); Army Reg. 600-20 §§ 5-6g(4)(g) (2009).

[9]   Dave Philipps, *The Marines Reluctantly Let a Sikh Officer Wear a Turban. He Says It's Not Enough,* N.Y. Times (Sept. 26, 2021), https://perma.cc/LV3V-7UZV; Army Directive 2017-03 (Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation) (Jan. 3,

to insist on "uniformity," at least when it comes to the articles of faith of religious minorities, sending the clear message that no Sikhs need apply.

<u>Prior Engagement with Defendants Regarding Sikh Religious Accommodations</u>

Beginning in September 2019, counsel for Plaintiffs began outreach to then-Chief of Naval Personnel, John B. Nowell, Jr., to express concerns regarding Navy policies surrounding religious accommodations. Klapper Decl. Ex. A. Over the course of 2020 and early 2021, counsel continually engaged via letters and teleconferences with the Navy General Counsel's office, including with then-Acting General Counsel Garrett Ressing and others. *See, e.g.*, Klapper Decl. Ex. B, C. At all times, counsel made it clear that these discussions were an effort to clear a path of equal access to employment for observant Sikhs to join the Marine Corps, and that the Navy General Counsel's office should be prepared to receive Sikh religious accommodation requests in the near future.

<u>Milaap Singh Chahal's Commitment to the Sikh Faith</u>

Milaap Singh Chahal has been a practicing Sikh since childhood. Compl. ¶ 123. As a first-generation Sikh American born in California, his faith goes to the core of his identity and motivates him with the desire to serve his fellow Americans daily as a Marine. Compl. ¶¶ 130-31. Since he was 11 years old, he has worn a turban continually, never shaved his facial hair, and attended religious services at Gurdwara every week with his family. Compl. ¶ 123. He also attended Sikh school on weekends. *Id.* At age 15, Chahal participated in the *Amrit Sanskar* ceremony of initiation, where he was "reborn" and began a "new chapter" in his life as an *amritdhari* or fully initiated Sikh, wearing all five religious articles continually: the *kesh* (unshorn hair), the *kanga* kept in his turban, the *kara* on the wrist, the *kacchera* undergarment, and the *kirpan* carried on his

---

2017), https://perma.cc/V25D-4LPJ; Secretary of the Air Force, Air Force Instruction 36-2903, Dress and Personal Appearance of Air Force Personnel (Feb. 7, 2020), https://perma.cc/ME57-FDM7; Secretary of the Air Force, Air Force Policy Directive 52-2, Accommodation of Religious Practices in the Air Force (July 28, 2020), https://perma.cc/RX7U-ZEMX; *see also* Secretary of the Air Force, Department of the Air Force Instruction 52-201, Religious Freedom in the Department of the Air Force (June 23, 2021), https://perma.cc/E3HQ-MNZS.

person. Compl. ¶¶ 124-25. Chahal also fully practices other aspects of his faith, including attending Gurdwara daily after work for multiple hours, where he participates in prayers, hymns, and religious discussion. Compl. ¶ 126. Every week, he volunteers his time teaching martial arts to Sikh children. Compl. ¶ 127. Because of his religious beliefs, he is a vegetarian, and he does not consume tobacco or alcohol. Compl. ¶ 128.

<u>Chahal's Desire to Join the Marine Corps</u>

Chahal is currently a fully qualified candidate for accession into the Marine Corps. Ever since he was a child, he has wanted to serve his country in the armed forces because of his love for America and his passion for defending his community from injustice. Compl. ¶ 130. Chahal's faith is at the core of his decision to become a Marine, and he believes every American should give back to their country through military or government service. Compl. ¶ 131. Chahal desires to join the Marine Corps specifically because it prides itself on being one of the most elite institutions in the world. Compl. ¶ 136. He wants to follow in the legacy of military service, as many observant Sikhs have before him, and is committed to giving his all to the Marine Corps. *Id.* That is why he made this request before accession. Compl. ¶ 137. Being forced to shave his beard and cut his hair to enter recruit training would violate his sincere religious beliefs and practices observed since childhood, incurring irreparable harm to his religious identity. Compl. ¶ 86.

In high school, Chahal participated in Air Force Junior Reserve Officer Training Corps (ROTC) at Federal Way High School. Compl. ¶ 132. Though he joined his freshman year and submitted a religious accommodation request then, he was initially not permitted to wear the uniform or to participate in drills because of his turban. Compl. ¶ 133. He also experienced ridicule and backlash from authority figures due to his articles of faith. *Id.* Despite these challenges, Chahal continued showing up and was committed to participating to whatever extent possible. *Id.* Eventually, he received a letter from the Pentagon ensuring that he could wear his turban, beard,

and religious articles with his uniform and began fully participating in the program. Compl. Ex. GG.

Throughout his Air Force Junior ROTC participation, Chahal received numerous ribbons, including dress-and-appearance, academic, leadership-school, and achievement ribbons. Compl. ¶ 134. Thus, despite the initial discrimination he experienced, Chahal enjoyed and valued his time in the program and the experience strengthened his goal of serving his country in the military. Compl. ¶ 135.

<u>Aekash Singh's Commitment to the Sikh Faith</u>

Aekash Singh has also been a practicing Sikh since childhood. Compl. ¶ 170. In 2007, shortly after he was adopted at the age of five, he immigrated to the United States and became a citizen that same year. Compl. ¶ 179. He has lived in San Carlos, California ever since, and speaks English, Hindi, and Punjabi. *Id.* His Sikh faith requires him to defend his community and to protect against injustice. Compl. ¶ 178. He has never cut his hair, and he has worn a turban since eighth grade, even when he was the only student wearing one at his school. Compl. ¶¶ 170-71. These religious articles are an integral part of his identity. Compl. ¶ 171. Aekash keeps his hair, including his beard, unshorn because maintaining it in a natural state is regarded as living in harmony with the will of God. Compl. ¶¶ 81, 171. Throughout his childhood, Aekash attended Gurdwara every week and he has continued attending regularly. Compl. ¶ 172. As part of his religious practice, Aekash does not drink alcohol. Compl. ¶ 177. He also seeks to learn more about the history of his faith by reading scriptures and other sacred texts. *Id.*

As a child, Aekash participated in *Charni Lagna*, an auspicious ceremony celebrating his ability to read from the Guru Granth Sahib, the Sikh holy scripture written in Gurmukhi, the written form of the Punjabi language. Compl. ¶ 173. He also participated in the *Dastar Bandi* turban-tying ceremony, where he publicly committed to wear his turban as a spiritual discipline signifying sovereignty, dedication, self-respect, morality, courage, and piety. Compl. ¶ 175. The turban has immense spiritual and temporal significance to Aekash, and he wears it out of love and as a mark of commitment to his faith. *Id.* To this day, he has never gone out in public without a turban and

wears a *patka* (a smaller head covering) even when he is swimming or playing competitive sports. *Id.* Since he was a young child, Aekash has also continually worn the *kara*, an iron or steel bracelet, to remind himself that he is a servant of God and should not take any action that may bring shame or disgrace. Compl. ¶ 176. In short, Aekash's religious exercise and identity is intertwined with these articles of faith, which have deep spiritual and moral significance to him.

<u>Aekash Singh's Desire to Join the Marine Corps</u>

Aekash believes in giving back to his country and committing to something greater than himself. Compl. ¶ 179. Members of his family have a history of military service, including a great-great-grandfather who served in World War II and an uncle who currently serves as an officer in the U.S. Army. Compl. ¶ 180. Like brave Sikhs before him, he wishes to follow in this legacy of service and leadership. *Id.* His interest in joining the U.S. military started at a young age, when he heard stories from his mother who—from her own childhood—wanted to be a pilot in the Air Force. Compl. ¶ 181. When his parents got married, they both wanted to join the Army, but were unable to because his father would have had to cut his hair and violate his religious beliefs. Compl. ¶ 182. Aekash later became passionate about the Marine Corps after speaking with the father of one of his best friends who is a retired Marine. Compl. ¶ 183. Aekash views the Marine Corps as the most challenging branch of the U.S. military when it comes to training and discipline, and he is committed to meeting this challenge to defend his country and support the brave women and men in our military in the air, on the ground, and in the water. Compl. ¶ 184. He also views the Marines as the "warrior" branch of the military, which he relates to the rich tradition of Sikhs serving as courageous warriors against injustice. *Id.* Aekash passed all physical and medical tests in October 2020, and first submitted his religious accommodation request on March 1, 2021. Compl. ¶¶ 186, 189. He is honored by the opportunity to serve in a manner that reflects the Marine Corps values of honor, courage, and commitment. Compl. ¶ 184.

<u>Jaskirat Singh's Commitment to the Sikh Faith</u>

Jaskirat Singh has also been a practicing Sikh his entire life. Compl. ¶ 150. He is a second-generation Sikh American born in Texas. *Id.* His faith goes to the core of his identity and motivates

him to serve his fellow Americans. Compl. ¶ 155. Like all other observant Sikhs, he sincerely believes that keeping his hair unshorn is an essential part of the Sikh faith and way of life, and that removing hair from the body is as reprehensible as adultery. Compl. ¶¶ 153-54. As a young man, he underwent the *Dastar Bandi* turban-tying ceremony, where he publicly committed to wear his turban as a religious exercise, and as an adult Sikh he believes he should always cover his head with a turban. Compl. ¶ 153. The *Rehat Maryada* mandates the turban as a reminder of the Sikh's duty to maintain and uphold the core beliefs of the faith. Compl. ¶ 154. Historically, uncut hair and turbans have been central features of an observant Sikh's identity, and to deny Jaskirat these aspects of his religious identity is to deny him the right to belong to the Sikh faith. *Id.* Jaskirat has also worn his *kara* since he was a small child, and he abstains from alcohol and tobacco as a matter of religious devotion. Compl. ¶¶ 151-52.

### Jaskirat Singh's Desire to Join the Marine Corps

Ever since Jaskirat was a child, he has wanted to serve his country in the armed forces. Compl. ¶ 155. This desire arose from his love for America and his passion for defending others from injustice—values that are rooted in his religious faith. *Id.* Because he wants to follow in the legacy of military service, as his great-grandfather and many other observant Sikhs have before him, he is committed to becoming a Marine. Compl. ¶ 160. He has passed all physical and medical tests and, if not for his accommodation request, would—in the eyes of the Marine Corps—be ready to begin his recruit training. Compl. ¶ 158. The Delayed Entry Program, which Jaskirat entered when he signed his contract, allows a recruit to wait only one year to begin recruit training. Compl. ¶ 169. Thus, absent relief from this Court, his contract will expire on April 30, 2022. *Id.*

### Relevant U.S. Marine Corps Regulations

Both the Department of Defense and the Marine Corps have adopted regulations regarding religious accommodation requests. Department of Defense regulations state that the Department "will normally accommodate practices of a Service member based on sincerely held religious belief." Compl. Ex. Y at ¶ 1.2(e). These regulations explicitly adopt the language and legal standards of RFRA: if a military "policy, practice or duty substantially burdens a Service member's

exercise of religion, accommodation can only be denied if" the policy is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." *Id.* The instruction also affirmatively provides that the Department of Defense "will accommodate individual expressions of sincerely held beliefs . . . which do not have an adverse impact on military readiness, unit cohesion, good order and discipline, or health and safety." *Id.* at ¶ 1.2(b).

The Marine Corps grooming regulations incorporate these instructions by reference. "Marines may wear . . . [a]rticles of religious apparel which are not visible or apparent when worn with the uniform" and "[v]isible articles of religious apparel with the uniform as permitted by 10 U.S.C. § 774, 42 U.S.C. § 2000bb-1, DoDI 1300.17, and SECNAVINST 1730.8, with approval of CMC or designee." Compl. Ex. V, MCO 1020.34H (May 1, 2018), at ¶ 6(a)-(c).

The Marine Corps also recently updated its religious accommodation guidance, recognizing its obligations under both RFRA and the Free Exercise Clause. Compl. Ex. L, MCO 1730.9 (July 12, 2021). These regulations describe the detailed process for religious accommodation requests, both pre-accession and post-accession. *Id.* These regulations make clear that "service members have a right to observe the tenets of their religion," and they fully incorporate the standards of RFRA. *Id.* ¶¶ 1, 3(a)(1). Finally, MCO 1730.9 emphasizes that "[n]o Marine will be asked to change their personal beliefs, including religious beliefs, which are protected by the United States Constitution" and that the Marine Corps "has an obligation to try to find ways to facilitate each Marine's commitment to their faith as well as to each other." *Id.* at ¶ 3(b)(3).

<u>Milaap Singh Chahal's Efforts to Obtain an Accommodation</u>

On March 1, 2021, Chahal sought a religious accommodation allowing him to wear his hair uncut, including an unshorn, neatly groomed beard, and to wear the turban with his Marine uniform, to fully reconcile his religious identity with his service as a Marine. Compl. Ex. BB. On June 30, 2021, he went with his recruiters to a Military Entrance Processing Station (MEPS), where he passed the Armed Services Vocation Aptitude Battery (ASVAB) test. Compl. ¶ 138. He also passed all other physical and medical tests required for entrance into the Marines. *Id.* His recruiters

told him he was fully qualified to join, but they sent him home early from MEPS saying he could not sign a contract or swear in without either removing his turban and hair or receiving a religious accommodation. Compl. ¶ 139.

On September 27, 2021, the Deputy Commandant for Manpower and Reserve Affairs ("DC M&RA") granted a temporary, partial accommodation, with severe limitations. Compl. Ex. J. Most egregiously, to commence his service, Chahal must cut his hair and shave his beard, and also abandon all other articles of faith—even those *not visible* when he's in uniform—for the duration of his recruit training. *Id.* at ¶ 4a. After recruit training, he would still have to shave his beard and discard his turban whenever serving in a ceremonial role. *Id.* at ¶¶ 4b(2), (5). And he would not be allowed maintain a beard when deployed and receiving "hostile fire" or "imminent danger" pay— a status that accompanies deployments to over 30 nations where the U.S. military has a presence, including countries such as Greece, Israel, and Kenya. *Id.* at ¶ 4b(3). His accommodation letter also suggested that, after accession, the accommodation could be subject to revocation by subsequent commanders and upon permanent changes of station or assignment. *Id.* at ¶ 6.

On October 21, 2021, Chahal submitted an appeal to the Commandant of the Marine Corps, requesting an accommodation allowing him to wear his beard, unshorn hair, and religious articles during recruit training in accordance with his sincere religious beliefs. Compl. Ex. K. Chahal also requested the ability to wear his beard and turban after recruit training, in both ceremonial and deployment environments, throughout his career. Nearly six months later, his appeal is still awaiting a response. Even though the Marine Corps is obligated by its own regulations to forward his request up the chain of command within 30 days and issue a response within 60 days, Compl. Ex. L at ¶¶ 4b(1)(b)-(c), a total of 174 days have passed with no response. Continuing to await a response is futile given Defendants' consistent unwillingness to grant accommodations during recruit training. Moreover, Chahal will continue to face a total barrier to entry into his career, and even if the barrier eventually falls, continued delay eventually will force him to start the entrance process over again because his ASVAB test results will expire in June 2023. Compl. ¶ 149.

Aekash Singh's Efforts to Obtain an Accommodation

When Aekash first began conversations with recruiters, he expressed a desire for religious accommodation so that he could join the Marines without compromising his core religious beliefs and practices. Compl. ¶ 185. After working with a recruiter, Aekash went to MEPS on September 30, 2020. Compl. ¶ 186. He took and passed the ASVAB test and physical tests at that time, but MEPS personnel refused to give him a contract to sign. *Id.* Instead, they asked Aekash if he would cut his hair. *Id.* When he declined because of his religious beliefs, the recruiter told him he was not authorized to join the Marines. *Id.*

A formal accommodation process for pre-accession recruits was not yet in place, but Aekash's recruiter encouraged him to submit a request for accommodation and promised to help in getting it processed. Compl. ¶ 187. On October 9, 2020, under guidance from recruiters who told him he could enter the Delayed Entry Program, Aekash returned to MEPS to swear in, again was asked to sign a document promising to cut his hair. Compl. ¶ 188. When he declined because of his religious beliefs, he was told to leave the swear-in room and denied entry once again. *Id.*

Aekash then submitted a pre-accession request for religious accommodation to the DC M&RA, Defendant LtGen David Ottignon, on March 1, 2021. Compl. Ex. O. On March 2, Aekash's attorneys shared a copy of his request with then-Acting Navy General Counsel Gary Ressing and were ultimately referred to Major General Daniel Lecce. Compl. ¶ 190.  Over the next seven months, Aekash's attorneys spoke multiple times with Major General Lecce, who confirmed on June 3, 2021 that "[w]e are tracking your client[']s pending accommodation request." Compl. ¶ 193. Per Marine Corps regulations, this pre-accession request should have been forwarded to the DC M&RA within 30 days of submission to his recruiter, and the DC M&RA should have made its review and final determinations within 60 days of receipt. Compl. Ex. L at ¶¶ 4b(1)(b)-(c). The Marine Corps missed both these deadlines.

After repeated attempts by Aekash's attorneys to receive updates about his accommodation request over the course of a year, counsel for the Commandant claimed on October 8, 2021, that Aekash "has not officially begun the religious accommodation process" and "would need to re-

initiate communication with Marine Corps recruiters to confirm that he is still interested in enlisting." Klapper Decl. Ex. D; Compl. ¶ 194. But Aekash had consistently responded to his recruiters and continued expressing his interest in joining the Marine Corps. Nonetheless, in the interest of moving his accommodation forward—and given his desire to serve our country as a Marine—in October 2021, Aekash re-delivered in person his original religious accommodation package to Marine Corps Recruiting Command. Compl. ¶ 196. Two months later, in December 2021, his recruiter responded by asking him to write a statement erroneously confirming that he was a "conscientious objector" "due to [his] religion," because "the command is asking for it." Compl. Ex. CC. Aekash again clarified that he wants "to obtain a religious accommodation to enlist into the United States Marine Corps," not that he is a "conscientious objector." *Id.*

On February 22, 2022, nearly a year after Aekash's original request and four months after he resubmitted the same request, the DC M&RA granted a temporary, partial accommodation with severe limitations. Compl. Ex. Q. Most egregiously, to commence his service, Aekash would, for the first time ever, have to cut his hair, shave his beard, and abandon his *kara* to commence his recruit training. *Id.* at ¶ 3a. And like Chahal, he would not be allowed to maintain his beard when deployed and receiving "hostile fire" or "imminent danger" pay. *Id.* at ¶ 3b(5). His accommodation letter also suggests that, after accession, the accommodation could be subject to revocation by subsequent commanders and upon permanent changes of station or assignment. *Id.* at ¶ 5.

To follow the Marine Corps' internal procedures, Aekash submitted his appeal on March 8, 2022. Compl. Ex. R. But awaiting a response would be futile given Defendants' consistent unwillingness to grant accommodations during recruit training. In the meantime, since the Marine Corps claims to have lost his original request after taking nearly a year from his first submission to respond, he continues to face a complete barrier to his Marine Corps career. Klapper Decl. Ex. D. Further, continued delay eventually will force him to start the entrance process over again because his ASVAB test results will expire in September 2022. Compl. ¶ 205. Urgent relief is thus warranted.

<u>Jaskirat Singh's Efforts to Obtain an Accommodation</u>

On November 24, 2021, Jaskirat Singh sought a religious accommodation allowing him to wear his hair, including his beard, uncut, and to wear the turban while in uniform to fully maintain his religious identity while serving as a Marine. Compl. Ex. M. On February 7, 2022, Jaskirat received a response from Defendant Ottignon, the Deputy Commandant for Manpower and Reserve Affairs. Compl. Ex. A. The partial, temporary approval Jaskirat received does not protect his religious exercise because of the many limitations imposed. Under his current accommodation, during recruit training, Jaskirat is not authorized to wear any of his articles of faith. *Id.* at ¶ 3a. Thus, in order to enter the Marines Corps at all, Jaskirat would have to violate his faith by shaving and cutting his hair for the first time ever. He could not wear his *kara* either. After recruit training, Jaskirat may only wear a beard when not receiving hostile-file or imminent-danger pay. *Id.* at ¶ 3b(5). If deployed to one of the dozens of locations covered by these categories, he would immediately have to shave his beard, regardless of whether the location presents any actual threat to safety. His accommodation letter also suggests that, after accession, the accommodation could be subject to revocation by subsequent commanders and upon permanent changes of station or assignment. *Id.* at ¶ 5. In explaining its denial of Jaskirat's request for accommodation during recruit training, the Marine Corps claimed a need for "breaking down individuality and training recruits to think of their team first." *Id.* at ¶ 2d. Given the Marine Corps' extensive consideration of this issues, it is unlikely that its position will change in response to Jaskirat's internal appeal, which he filed on February 21, 2022. Ex. N.

<u>Other Accommodations Granted by the U.S. Military and Marine Corps</u>

Other branches of the U.S. military currently accommodate service members with religious beards and turbans, including Sikh service members. Since the Army changed its policy in 2017, at least 100 Sikhs currently serve with courage and distinction.[10] The Army allows religious beards except when there is actual risk of CBRN (chemical, biological, radiological, and nuclear)

---

[10]   Philipps, *The Marines Reluctantly Let a Sikh Officer Wear a Turban. He Says It's Not Enough*, https://perma.cc/25E4-XNVR.

exposure.[11] In February 2020, the Air Force updated its policy to allow religious beards, and it has recently approved individual accommodations for Muslim and Sikh service members, among others.[12]

Further, the Marine Corps recently relaxed other aspects of its grooming policies to improve its diversity outreach, directly undermining its claim that its interest in uniformity is so compelling that protected expression of diverse faith traditions must give way. Compl. Ex. W (relaxing regulations for male haircuts, helmet caps, fingernail polish, and maternity dress); Compl. Ex. B (relaxing tattoo regulations); Compl. Ex. T (expanding medical beard accommodations). As General David Berger explained, "[t]he Marine Corps draws its collective strength and identity from all its Marines, so it is critical that we prioritize policies that maximize the individual strengths of every Marine, regardless of race, gender, sexual orientation, creed, or any other marker."[13] And on November 15, 2021, Secretary of the Navy Carlos del Toro issued guidance to the Navy and the Marines stating that "[d]iversity, equity and inclusion (DE&I) are inextricably linked to the readiness and mission success of our Navy and Marine Corps team." Compl. Ex. X. He explained that "[a]ccessing individuals with different perspectives adds to our ability to solve problems on and off the battlefield, and amplifies the capability of our forces . . . . To successfully meet those challenges, we require a Navy and Marine Corps that is diverse, with a wide array of ideas and capabilities, a total force that reflects the Nation whose principles we defend." *Id.* Secretary del Toro also recently committed to "emphasizing diversity, equity, and inclusion in every aspect of our force," because "[we] can only overcome the complex challenges we face every day by cultivating the talent and unique insights of individuals from diverse personal,

---

[11]   *See* Army Directive 2018-19 ¶ 5(b)(1)-(2) (Nov. 8, 2018), https://perma.cc/X7P8-8492.

[12]   *See* Air Force Instruction 36-2903, Dress and Personal Appearance of Air Force Personnel, https://perma.cc/ME57-FDM7; *see also* Oriana Pawlyk, *Air Force Special Operations Approves First Beard, Turban Waiver for Sikh Airman*, Military.com (July 30, 2020), https://perma.cc/4UZZ-TX3G.

[13]   Philip Athey, *Here's Where Ponytails Stand for Women in the Marine Corps*, Marine Corps Times (Nov. 4, 2021), https://perma.cc/DR75-BAP3.

cultural, and professional backgrounds."[14] Thus, multiple high-ranking officials have acknowledged the importance of diversity, including religious diversity, as not only aligned with the Marine Corps' goals but in fact mission critical.

To further these goals, the Marines updated its grooming policies on October 29, 2021 to allow for tattoos anywhere on the body except the head, neck, and hands, including full-sleeve tattoos. Compl. Ex. B. It also allows Marines and applicants with face or neck tattoos that would not be covered by the uniform to request exceptions. *Id.* at ¶ 4(a)(2)(h). Since 2018, the Marines has also allowed women to wear alternative hairstyles including locks, twists, and braids. Compl. Ex. V. And on January 21, 2022, the Marine Corps announced its new exemption policy for Marines with medical-beard needs such as *pseudofolliculitis barbae*, a painful facial condition—affecting roughly 60% of African-American men—inflamed by shaving.[15] Compl. Ex. T. While the Marines has long permitted temporary exemptions to its grooming requirements for service members with medical conditions, medical personnel are now authorized to grant *permanent* exemptions directly without going through the requesting individual's commander. *Id.* Marines are no longer required to carry a copy of their medical waiver on their person. *Id.* Further, Marines can no longer be separated or denied reenlistment because of ongoing medical conditions that prevent them from shaving. *Id.* On March 23, 2022, the Marines released yet another grooming update, allowing fingernail polish and updated maternity options for female Marines, extending some limitations on hair length, and allowing male Marines to adjust their hairlines and wear helmet caps beneath

---

[14]   Carlos Del Toro, *One Navy-Marine Corps Team: Strategic Guidance From The Secretary of the Navy,* 5 (Oct. 2021), https://perma.cc/MDT2-7TQM.

[15]   As of 2020, there are 17,089 Black male Marines on Active Duty. *2020 Demographics: Profile of the Military Community*, Department of Defense, https://perma.cc/Q38V-AJN5. An estimated 60% of them suffer from *pseudofolliculitis barbae. Pseuodfolliculitis Barbae*, American Osteopathic College of Dermatology, https://perma.cc/EB8Z-SXGU; *see also* Geoff Ziezulewicz, *How the Navy's Beard Policy Discriminates Against Black Sailors*, Navy Times (Apr. 5, 2022), https://perma.cc/T3D3-MG7U.

their helmets. Compl. Ex. W. These changes are designed to "promote a culture of inclusion while maintaining a high level of professionalism."[16]

As General David Berger recently acknowledged, such efforts do not undermine the Marine Corps' ability to accomplish its mission, but instead further it because "[t]here's a retention incentive in there that we don't fully appreciate, that is taking care of the individual."[17] In short, most of the time, the Marine Corps gets the tradeoff between uniformity and diversity right. Yet when it comes to statutorily and constitutionally protected religious expression, it chooses to discriminate.

## STANDARD FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs are entitled to a preliminary injunction allowing them to maintain their hair, beards, and religious articles (including the turban) during recruit training and for the pendency of this case. When seeking a preliminary injunction under Federal Rule of Civil Procedure 65, a plaintiff must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm if injunctive relief is not granted; (3) that the balance of interests among the parties favors injunctive relief; and (4) that injunctive relief would be in the best interest of the public generally. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). As explained fully below, Plaintiffs are suffering and—absent injunctive relief— will continue to suffer a deprivation of their rights under RFRA, the Free Exercise Clause, and the Fifth Amendment's guarantee of equal protection. All four factors thus line up in their favor.

## ARGUMENT

In this application for preliminary injunction, Plaintiffs raise four of the claims set forth in the verified complaint regarding the denial of their accommodation requests: (1) Count I, applying RFRA; (2) Counts II and III, applying the Free Exercise Clause; and (3) Count VI, applying the

---

[16]   *Updated Uniform Regulations per MARADMIN 134/22*, Facebook (Mar. 23, 2022), https://perma.cc/3EX8-3FCL.

[17]   Philip Athey, *Corps' Sergeant Major Calls for Improved Treatment, Care of Junior Marines*, Marine Corps Times (Aug. 9, 2021), https://perma.cc/QL7K-6GWZ.

Fifth Amendment's equal protection guarantee. For the reasons set forth below, Plaintiffs are likely to succeed on the merits of each of these claims. The Marine Corps cannot show that forcing Plaintiffs to shave, cut their hair, and remove all religious articles to begin recruit training is the least restrictive means of furthering any compelling government interest. Because Plaintiffs are likely to succeed on the merits of their claims and satisfy the other injunctive relief factors as well, preliminary injunctive relief should be granted.

## I.   Plaintiffs are likely to succeed on their RFRA claims.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion" unless it "demonstrates that application of the burden *to the person*—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b) (emphasis added).

RFRA applies to the military, because the term "government" includes any "branch, department, agency . . . and official . . . of the United States," 42 U.S.C. § 2000bb-2(1); *see also Singh v. Carter*, 168 F. Supp. 3d 216, 229 (D.D.C. 2016) (granting TRO to protect Sikh Army soldier from discriminatory testing related to his religious beard and turban, because he showed a likelihood of success under RFRA); *Singh v. McHugh*, 185 F. Supp. 3d 201, 217 (D.D.C. 2016) (finding that Army's refusal to grant Sikh soldier an "accommodation that would enable him to enroll in ROTC while maintaining his religious practice" of wearing a beard and turban violated RFRA). These agencies include the Department of Defense, the Marine Corps, and their officers in their official capacities. *United States v. Sterling*, 75 M.J. 407, 410 (C.A.A.F. 2016) (citing "Secretary of the Navy Instr[uction] 1730.8B CH-1, Accommodation of Religious Practices," which applies RFRA to the Navy); *Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997) (applying RFRA against the Secretary of Defense and the Secretaries of the Army, Navy, and Air Force); *see also* Compl. Ex. Y at ¶ 1.2(e)(1) (adopting the RFRA standard for military accommodations).

At the preliminary injunction stage, the burdens of proof on a RFRA claim "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, it is the plaintiff's initial burden to show that his sincere religious exercise has been

substantially burdened. *Id*. at 428; *see also Holt v. Hobbs*, 574 U.S. 352, 360 (2015) ("[P]etitioner bore the initial burden of proving that the Department's grooming policy implicates his religious exercise."). But once that showing is made, the burden then shifts to the government to show that it has a compelling interest in overriding the religious exercise that cannot be satisfied through less restrictive means. *O Centro*, 546 U.S. at 429. Here, the Marine Corps cannot reasonably dispute that Plaintiffs' religious beliefs—the ordinary beliefs of hundreds of thousands of American Sikhs—are sincere and substantially burdened by Marine Corps grooming regulations and the restrictions placed in Plaintiffs' accommodations. Nor can the Marine Corps meet its own burden of proof. The only compelling government interest it asserts is that of uniformity. But even assuming that some level of uniformity qualifies, the Marine Corps' own actions show that the minor variations sought by Plaintiffs here would not implicate that interest. The Marine Corps has already conceded that many of the accommodations Plaintiffs seek will be permitted post-training, when serving in operational units might call for the heightened cohesion and *esprit de corps* purportedly enhanced by uniformity. And even during training, the Marine Corps allows many deviations from earlier standards of uniformity to accommodate individuals with interests that, unlike religion, have no constitutional protection. It follows that the Marine Corps cannot show that requiring Plaintiffs to shave, cut their hair, and remove their religious articles during training or in other phases of their careers furthers a compelling government interest at all, let alone in the least restrictive way.

### A. Plaintiffs are sincerely compelled by their Sikh faith to wear beards, unshorn hair, turbans, and other religious articles as a sign of devotion to God.

Plaintiffs' sincere desire to observe Sikh religious practice cannot reasonably be questioned. "Though the sincerity inquiry is important, it must be handled with a light touch, or 'judicial shyness.'" *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012) (quoting *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F.3d 248, 262 (5th Cir. 2010)). Thus, courts should limit themselves "to 'almost exclusively a credibility assessment' when determining sincerity." *Id*. (citing *Kay v. Bemis,* 500 F.3d 1214, 1219 (10th Cir. 2007)). At the preliminary

injunction stage, Plaintiffs' sworn statements are sufficient to establish their sincerity. *Roman Catholic Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 35 (D.D.C. 2021) ("find[ing] that the Archdiocese's belief is sincere" at the preliminary injunction stage based on sworn statements); *see also* Compl. ¶¶ 123-29 (Milaap Singh Chahal); ¶¶ 150-54 (Jaskirat Singh); ¶¶ 170-78 (Aekash Singh). That is particularly so where the sworn statement attests to longstanding pre-litigation engagement in the religious exercise. *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 294 (D.D.C. 2020) (finding sincerity "evident in the Church's pre-COVID-19 practices"). Further, while religious beliefs need not be "shared" by others to be protected by the law, the Supreme Court has found it instructive in a credibility determination that the asserted belief was "by no means idiosyncratic" within the broader faith community. *Holt*, 574 U.S. at 362. Here, longstanding Sikh practices, texts, and teaching align perfectly with Plaintiffs' beliefs that they "are enjoined to wear at all times the uniform of their beliefs," including "unshorn hair" and a beard. *Introduction to Sikhism*, 1 Religious Organizations and the Law § 1:23 (2d ed.). Thus, Plaintiffs have met their burden at the preliminary injunction stage to show a substantial likelihood that their accommodation request is based in sincere Sikh religious practice.

## B. The Marine Corps' refusal to accommodate Plaintiffs' religious practices imposes a substantial burden on their religious exercise.

There is also no question that refusing to accommodate Plaintiffs' Sikh religious practice would constitute a substantial burden on their exercise of religion. "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 717-18 (1981)). Although substantial burdens can come in other forms as well, it is well established that this standard is satisfied when the plaintiff is "force[d] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *see also Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) (finding a viable claim when lobbyists were forced to choose between their First Amendment right

to petition the government and the benefit of serving on a federal advisory committee). Being put to the choice of giving up their religious beliefs or giving up the opportunity to serve in the Marine Corps altogether (or facing military discipline or adverse administrative action if they refuse to shave and remove their religious articles for recruit training) unquestionably imposes a substantial burden on Plaintiffs' religious exercise. Case law in the military context and other closely controlled government environments (like prisons) confirms this conclusion. *See Holt*, 574 U.S. at 361 (grooming policy that subjected prisoner to "serious disciplinary action" for growing beard constituted a substantial burden); *McHugh*, 185 F. Supp. 3d at 217 (Army's refusal to grant Sikh soldier an "accommodation that would enable him to enroll in ROTC while maintaining his religious practice" constituted a substantial burden); *cf. Carter*, 168 F. Supp. 3d at 229 (Army's "specialized testing for further processing of [Sikh soldier's] religious accommodation request is a substantial burden when such testing is not required for soldiers to obtain exceptions from the Army uniform and grooming regulations"). Because the Marine Corps' grooming regulations impose a substantial burden on Plaintiffs' religious beliefs, they are entitled to an accommodation unless the Marine Corps can show that granting one would impair a compelling government interest that cannot be satisfied via a less restrictive means. As elaborated below, the Marines cannot make this showing.

### C. The Marine Corps has no compelling interest in forcing Plaintiffs to forgo their religious practice to commence serving their country.

Because the Marine Corps' regulations substantially burden Plaintiffs' religious exercise, "the burden [of strict scrutiny] is placed squarely on the [Marine Corps]." *O Centro*, 546 U.S. at 429. Defendants thus must prove that coercing Plaintiffs to shave and remove their religious articles before recruit training "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). This is the "most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), and a test that this Court recently ruled the armed forces flunked in a similar

case involving a Sikh recruit. *See McHugh*, 185 F. Supp. 3d at 225-227; *cf.* Army Directive 2018-19.

To meet RFRA's demanding test, the Marine Corps cannot simply cite "broadly formulated interes[ts]" that, at a high level of generality, seem compelling. *Holt*, 574 U.S. at 362. RFRA demands a "'more focused' inquiry: It 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014) (quoting *O Centro*, 546 U.S. at 430-31). In other words, the Marine Corps must show that it has a compelling interest in imposing its grooming requirement specifically *on Plaintiffs* during recruit training in particular. Thus, this Court must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and . . . look to the marginal interest in enforcing the challenged government action in that particular context." *Holt*, 574 U.S. at 363 (cleaned up). The Marine Corps "cannot simply invoke general principles" to deny a servicemember's religious accommodation. *McHugh*, 185 F. Supp. 3d at 223. It must evaluate Plaintiffs' request in the context of their particular circumstances of recruit training. And it must show it has a compelling interest in eliminating any "marginal" risk that arises from granting an accommodation to Milaap Singh Chahal, Aekash Singh, and Jaskirat Singh specifically. *Holt*, 574 U.S. at 363.

This rule applies even to critically important interests such as protecting public health during a pandemic, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); enforcing the nation's drug laws, *O Centro*, 546 U.S. at 433; prison safety, *Holt*, 574 U.S. at 362; prevention of animal cruelty, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543-44, 546 (1993); traffic safety, *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267-68 (11th Cir. 2005); protecting personnel in federal buildings, *Tagore v. United States*, 735 F.3d 324, 330-31 (5th Cir. 2013); and controlling government costs, *Rich v. Secretary, Florida Department of Corrections*, 716 F.3d 525, 533 (11th Cir. 2013). Under strict scrutiny, "so long as the

government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021).

The Marine Corps' *general* interests in uniformity, discipline, or good order are insufficient to justify forcing Plaintiffs to shave, cut their hair, and remove their religious articles before recruit training. Any purported interest in uniformity, discipline, or good order is fatally undermined by the fact that existing Marine regulations provide broad categorical exemptions for tattoos and various women's hairstyles. Moreover, the Marines has recently updated its beard policy to allow for permanent medical exemptions, to protect Marines from being separated or denied reenlistment for being placed in a "no shave" status, and to give medical officers authority to grant exemptions directly without having to go through the commander. *See, e.g.*, Compl. Ex. T (allowing medical officers to grant permanent exemptions from shaving when harmful to the individual's health); Compl. Ex. S (detailing exemption process for Marines with *pseudofolliculitis barbae*, which includes "no shave" chits); Compl. Ex. V at 1-14 (permitting three lengths of haircuts for female Marines); *id.* at 1-11 (setting a maximum length of male haircuts, but allowing some leeway within that maximum); *id.* at 1-12 (permitting mustaches and the shaving of the scalp).

The presence of both categorical exemptions and individualized exceptions creates "a higher burden" on the Marines to "show[] that the law, as applied, furthers [its] compelling interest[s]." *McHugh*, 185 F. Supp. 3d at 223 (quoting *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472-73 (5th Cir. 2014)). It also makes the existence of a compelling interest both more important (to guard against religious discrimination) and less likely. *Fraternal Ord. of Police v. Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.). As a unanimous Supreme Court explained, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (cleaned up). And "underinclusiveness . . . is often regarded as a telltale sign that the government's interest in enacting a liberty-restraining pronouncement is not in fact 'compelling.'" *BST Holdings, L.L.C. v. Occupational Safety and Health Admin.*, 17 F.4th 604, 616 (5th Cir. 2021).

In *Fraternal Order of Police*, for example, the Third Circuit struck down a police department's "no-beard" policy, concluding that its claimed need for uniformity to "convey the image of a 'monolithic, highly disciplined force'" was undermined when it allowed officers to grow beards for medical reasons. 170 F.3d at 365-67. Then-Judge Alito explained that "the Department has made a value judgment that secular (*i.e.*, medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." *Id.* at 366; *see also Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009) (affirming summary judgment for Muslim firefighters because the government failed to "proffe[r] evidence" that its "clean-shaven requirement [was] narrowly tailored to further the interest of protecting firefighters"); *Kennedy v. District of Columbia*, 654 A.2d 847, 855 (D.C. Cir. 1994) (highlighting how the D.C. Fire Department's arguments about the need for uniform grooming standards to promote "*esprit de corps*" and ensure proper operation of SCBA masks were undermined by inconsistent enforcement). Here, because the Marine Corps' regulations "presently do[] not apply" to thousands of servicemembers, the Marines' interests in denying an accommodation to Plaintiffs "cannot be compelling." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013).

The Supreme Court took an even stricter approach to this rule in *Fulton*, concluding that a City's "creation of a system of exceptions" to its nondiscrimination policy—even where no exception had yet been granted—fatally "undermine[d] the City's contention that its non-discrimination policies can brook no departures," thus failing strict scrutiny. *Fulton*, 141 S. Ct. at 1882. Here, the Marine Corps has not merely set forth the possibility of seeking exceptions from the uniformity standard—*e.g*., for visible and nonvisible tattoos, facial hair, braids, and so on—but it actually grants such exemptions in the name of diversity, recruitment, and retention. Compl. Ex. B; Compl. Ex. W. That makes this case easier than *Fulton*. Allowing the religious beards and turbans at issue here would impair uniformity no more than individual tattoos, diverse hairstyles allowed for women, or the diversity in height, build, skin color, and appearance that is unavoidable among any class of recruits. While uniformity certainly has a role, the Marine Corps

26

would not exist without diverse recruits. The exceptions that the Marine Corps carves out for other kinds of diversity reveal that its actual need is for a strong, uniformly committed team rather than Marines who appear identical.

In addition to fatally undermining its interests with categorical and individualized exemptions, the Marine Corps cannot show that its interest would be impaired by specifically allowing Plaintiffs to maintain their beards, hair, and religious articles during recruit training. *See O Centro*, 546 U.S. at 431 (government must prove "the asserted harm of granting specific exemptions to particular religious claimants"). The Marine Corps' regulations direct that commanding officers may only suspend religious accommodations if necessary due to "the imminent threat to health and safety." Compl. Ex. L at ¶ 4d(2)(b). But the Marine Corps has pointed to no such imminent threat *during recruit training*. To the contrary, recruit training is the period of a Marine's career when he is *least* likely to encounter enemy fire or other imminent threats to health or safety. Given that the Marine Corps' own regulations do not require Plaintiffs to immediately shave in violation of their religious beliefs, the Marines cannot claim a compelling interest in forcing them to do so. If unbending uniformity is such a critical element of mission accomplishment, surely the Marine Corps' interest would be stronger during actual missions—yet in that situation its accommodation is *more* generous, which undermines its alleged compelling interest for purposes of recruit training. *Cf. McHugh*, 185 F. Supp. 3d at 225 (Army lacked compelling interest in denying accommodation to Sikh ROTC applicant, because during training he would not encounter a "real tactical operation" where he would need to shave); *see also* Miller Decl. ¶¶ 5-10 (noting that Navy submarines often allow sailors to grow beards during deployment, and this does not interfere with their firefighting duties).[18]

---

[18] Should Plaintiffs be deployed during the pendency of this case, they reserve the right to seek further injunctive relief if the Marines seek to enforce prohibitions on their religious practice not narrowly tailored to a compelling military interest. For the purposes of this motion, however, Plaintiffs seek relief pertaining to their ability to commence recruit training, where the restrictions are at their maximum.

Experience from other branches confirms that the concerns underlying the need for uniformity—the promotion of good order and discipline—do not support a compelling interest when applied to religious accommodation. In *Singh v. McHugh*, for example, this Court rejected the same argument asserted here, noting that observant Sikhs serving in the past, "notwithstanding the deviation from the uniformity," had "earned commendations and outstanding reviews" from their peers and superiors. 185 F. Supp. 3d at 228. Further, the undisputed evidence showed that none of the "negative consequences" predicted by the Army actually came about. *Id*. at 229. Rather, accommodated Sikhs achieved "exemplary service records" once they "had the chance to prove themselves." *Id*. at 230. This Court explained in *McHugh* that even if a Marine's failure to follow standards in some instances "might signal a rebellious streak or reflect a lack of impulse control or discipline," applying that rationale to religious accommodations "fails to grapple with the fact that any deviation from the rules on [a religious observer's] part flows from a very different source. And therefore, the decision lacks the individual assessment that is fundamental under RFRA." *Id*. at 227 (requests for religious accommodations "do[] not stem from any lack of self-control, dedication, or attention to detail").

Since *McHugh*, the evidence has only mounted regarding how religious observance coincides with good order, with hundreds of observant Sikhs now serving with excellence in the Army and Air Force—suggesting that the Marine Corps' asserted compelling interest in enforcing uniformity by "training [Marines] to think of their team first" is simply not implicated.[19] To the contrary, the U.S. government has long recognized that failing to respect the "Free Exercise rights" of service members would both "diminish morale" and "weaken[] our national defense." *Katcoff v. Marsh*, 755 F.2d 223, 228 (2d Cir. 1985). So have the Marines: "Spiritual readiness is the quality of a Marine's inner self that distinguishes between courage and recklessness," "is as important as

---

[19]    *Compare* Compl. Ex. A at ¶ 2(d) *with* Joseph Lacdan, *For Massachusetts Soldier, Path to Military Service Was a Spiritual One*, U.S. Army News (Sept. 24, 2020), https://perma.cc/FL7N-SSYY ("Today, there are hundreds, if not thousands, of patriotic American Sikhs, Jews, Muslims, Christians and service-members of other faiths who now have religious accommodations.").

physical readiness or training," and "is the bedrock upon which the concepts of honor, courage, and commitment are built."[20] "Spiritual readiness is a force multiplier and is the foundation of moral courage," which allows Marines to do things that are right "no matter what the cost" and never permit things that are wrong "no matter what the circumstances." *Id.* Here, Plaintiffs' faith is the source of their spiritual readiness and motivation to give back to their country.

In analogous cases, other branches of the armed forces have tried and failed to meet the compelling interest standard with respect to the very same interests the Marine Corps' claims here. In one case, the Army denied Iknoor Singh's "request to wear unshorn hair, a beard, and a turban" because of the military's general interest in "[u]nit cohesion and morale," "[g]ood order and discipline," "[i]ndividual and unit readiness," and the Sikh applicant's "health and safety." *McHugh*, 185 F. Supp. 3d at 222; *see also Carter*, 168 F. Supp. 3d at 229, 234-36 (enjoining specialized military uniform testing that singled-out a Sikh military officer based on his request to wear unshorn hair, a beard, and a turban). Those justifications "d[id] not withstand strict scrutiny" then, *McHugh*, 185 F. Supp. 3d at 224, and the Marine Corps' similar interests do not now. In short, experience from other branches demonstrates what the Marine Corps ignores: that an accommodation for Plaintiffs to refrain from shaving and removing their religious articles consistent with their religious beliefs would not harm the Marine Corps' interests any more than the categorical deviations in uniformity inherent in the grooming regulations and the thousands of exceptions to uniformity the Marine Corps has granted to individual Marines.

### D. Even if the Marine Corps did have a compelling interest here, forcing Plaintiffs to violate their faith is not the least restrictive means of furthering that interest.

Because the Marine Corps cannot show a compelling governmental interest in applying shave orders to Plaintiffs before they begin recruit training, this Court need go no further. But even if the Marine Corps had shown such an interest, it could not show that forcing Plaintiffs to shave and

---

[20] *The Commander's Handbook for Religious Military Support*, U.S. Marine Corps, MRCP 3-30D.4.

remove their religious articles in violation of their religious beliefs is the least restrictive means of furthering that interest.

Under both DoD's incorporation of RFRA, Compl. Ex. Y, and the First Amendment's Free Exercise Clause, even when a compelling interest might exist as a general matter, the outright denial of a given request for religious accommodation must include an evaluation that there are no feasible alternatives to such a denial. Meeting this least-restrictive means standard is "exceptionally demanding." *Holt*, 574 U.S. at 364. But that is the intent of the standard—ensuring that the Government "must" use "a less restrictive means" if one "is available for the Government to achieve its goals." *Id.* at 365. This requires an evidence-based analysis that considers all available options. *See, e.g.*, *McHugh*, 185 F. Supp. 3d at 231 n.23 (finding that the military failed to pursue workable alternatives when it denied religious beard accommodation for observant Sikh); *Carter*, 168 F. Supp. at 232 (finding similarly). Where there are exceptions to a scheme that the Government insists is the least restrictive, those exceptions defeat the Government's insistence by "demonstrat[ing] that other, less-restrictive alternatives could exist." *McHugh*, 185 F. Supp. 3d at 232 n.25 (quoting *McAllen Grace*, 764 F.3d at 475).

Applying the standard here yields the same outcome as it did in the previous *Carter* and *McHugh* cases: the Government flunks the test. Plaintiffs' religious beards, uncut hair, and turbans could be accommodated in many ways without compromising the unity of the Marine Corps. As stated above, various neat and conservative deviations from the ordinary uniform are permissible within the Marine Corps without concern of breaking from the sense of unity or detracting from the mission. Such styles include full-sleeve tattoos, mustaches for male Marines and haircuts of various lengths of hair for female Marines. *See* Compl. Ex. B; Compl. Ex. W; Compl. Ex. V at 1-12, 1-14, 1-15, fig.1-3.

The Marine Corps' total ban on religious articles during recruit training is not the least restrictive means of accomplishing its interest in uniformity.  Plaintiffs made clear in their original requests that they will maintain their hair and beards in a neat and conservative manner that presents a professional appearance at all times. Compl. Ex. BB; Compl. Ex. N; Compl. Ex. O. This

underscores that the accommodation does not mean that Plaintiff's "training would be devoid of '*any* emphasis on uniformity . . . or that these concerns could not be advanced some other way,'" including the requirement that they maintain their turban and unshorn hair and beard in a neat and orderly manner so as to "present a disciplined . . . appearance." *McHugh*, 185 F. Supp. 3d at 231.

Moreover, the policies of similarly situated entities confirm that the Marine Corps cannot meet the least restrictive means test. For instance, Army regulations permit a "large-scale exception . . . to its grooming policies" by allowing soldiers to grow beards where medically necessary. *McHugh*, 185 F. Supp. 3d at 226. Since 2007, "the Army has permitted more than 100,000 service members," including officers, "to grow beards for medical reasons." *Id.* at 224 (noting that the Army has authorized "at least 49,690 permanent 'shaving profiles,' and at least 57,616 temporary ones."). The Air Force has similarly liberalized its beard policy, especially in seeking to accommodate the religious beliefs of service members.[21] U.S. Navy regulations have also recognized the importance of this kind of narrow tailoring, stating that observant Sikh sailors who are granted a religious accommodation for the turban "are not required to wear military headgear in addition to their religious head covering if such military headgear would violate their sincerely held religious beliefs," subject to the sole exception of "the case of safety or protective headgear required by a Sailor's duties, position or assignment." Compl. Ex. D at ¶ 5d(4)(a). The Marine Corps, therefore, at a minimum, carries a burden to show why these accommodations that have proven consistent with good order and safety on other "well-run" branches of the military could not equally accommodate the Marine Corps' needs. *Cf. Holt*, 574 U.S. at 368 (state prison was outlier in barring religious conduct other prisons had shown could be allowed safely).

Militaries around the world also accommodate servicemembers with religious headwear and beards, including in the United Kingdom, Canada, Australia, New Zealand, India, Israel, and the

---

[21]   *See* Air Force Instruction 36-2903, Dress and Personal Appearance of Air Force Personnel, https://perma.cc/ME57-FDM7 ("Beards are not authorized unless for medical reasons . . . or as authorized pursuant to a request for a religious accommodation."); *see also id.* Attachment 9 (offering "Sample Turban, Uncut Beard and Hair Approval Memorandum" templates for commanding officers).

United Nations. Many other countries including Germany, Hungary, and other NATO members also allow beards for non-religious reasons without detracting from mission readiness. Miller Decl. at ¶ 12. Canada's former Minister of Defence, Harjit Sajjan, is a fully observant Sikh who previously served alongside U.S. forces in Afghanistan with his full beard. Plaintiffs' Sikh counterparts in the Australian Army have specific accommodations for keeping their hair and beard uncut and wearing the turban.[22] In the interest of maintaining a good international image as a nation that upholds religious liberties, it would be incongruous for Plaintiffs to have less leeway in this religious accommodation than what their counterparts in the Australian Army are permitted. Furthermore, the presence of this accommodation in the Australian Army, an allied force with many parallels to the U.S. military, shows that such accommodation is possible without detracting from the unity of the force.

Because forcing Plaintiffs to shave, cut their hair, and remove their religious articles against their religious beliefs is not the least restrictive means of promoting any compelling government interest, they are likely to succeed on the merits of their RFRA claim.

## II. Plaintiffs are likely to succeed on their Free Exercise Clause claims.

Plaintiffs are also likely to prevail on their Free Exercise claims. Government action that burdens religious exercise is subject to strict scrutiny under the Free Exercise Clause if it is "not neutral or not of general application." *Lukumi*, 508 U.S. at 546. "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877; *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (actions trigger strict scrutiny "whenever they treat *any* comparable secular activity more favorably than religious exercise"). Here, the permitted deviations from uniformity—including deviations that allow alternate hairstyles, permanent beard accommodations for medical reasons, and tattoos in all circumstances—pose the exact same risks

---

[22]   *See, e.g.*, Army Dress Manual, The Australian Army, Effective Dec. 20, 2019 at 2-21 through 2-24 (Sections 2.67-2.71).

to the government's alleged interests, regardless of the reason for the beard or other deviations. Thus, these exceptions trigger strict scrutiny. *Fulton*, 141 S. Ct. at 1877.

In *Lukumi*, the Supreme Court unanimously struck down an example of government action as not neutral or generally applicable. *Lukumi* involved four municipal ordinances that restricted the killing of animals. When challenged, the city argued that the ordinances were neutral because they were written "in secular terms, without referring to religious practices." *Lukumi*, 508 U.S. at 534. The Supreme Court emphasized that when determining whether a law is neutral and generally applicable, "[f]acial neutrality is not determinative." *Id.* The Court explained that because the ordinances applied to "Santeria adherents but almost no others," they prohibited Santeria sacrifice "even when it does not threaten the city's interest in the public health," and "selective[ly]" "impose[d] burdens only on conduct motivated by religious belief," they were not neutral or generally applicable. *Id.* at 536, 538-39, 543.

Like the City's treatment of Santeria worship, the Marine Corps' treatment of Plaintiffs has not been neutral or generally applicable. As discussed, exceptions to the uniform-appearance policies (including beard, hairstyle, and tattoo exemptions) are available for nonreligious reasons such as diversity, recruitment and retention, and medical needs, thus treating "comparable secular activit[ies] more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. And the Supreme Court has made clear that the mere *existence* of a discretionary exemption process, no matter "whether any exceptions have been given," subjects a regime to strict scrutiny. *Fulton*, 141 S. Ct. at 1879. This principle applies to the exemption processes the Marine Corps holds out for other breaches of uniformity, for example, its process to seek exemptions for tattoos that would not be covered by uniforms or would otherwise violate its policy. Compl. Ex. B at ¶ 4a(2)(h).

By refusing to grant Plaintiffs an accommodation to practice their faith while granting accommodations for other reasons, the Marine Corps has impermissibly "impose[d] special disabilities on the basis of . . . religious status," *Lukumi*, 508 U.S. at 533 (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)). In light of this disparate treatment, the Marine Corps' conduct should be evaluated with strict scrutiny under the Free Exercise Clause as well as under RFRA

(which already poses strict scrutiny as a default rule). As explained above, the Marine Corps'
regulations, as enforced against Plaintiffs, are not the least restrictive means of upholding a
compelling government interest.

### III.   Plaintiffs are likely to succeed on their Equal Protection claims.

Plaintiffs are also likely to succeed on their Equal Protection claims under the Due Process
Clause of the Fifth Amendment.[23] "Strict scrutiny . . . is warranted if the restriction 'jeopardizes
exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic.'"
*Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) (quoting *Nordlinger v. Hahn*, 505
U.S. 1, 10 (1992)); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).
The Marine Corps' actions here both jeopardize the exercise of a fundamental right—Plaintiffs'
religious exercise—and categorize them on the basis of an inherently suspect characteristic—their
religion, and more specifically, the religious basis of their need for a hair and garb accommodation.

Engaging in religious expression is the exercise of a fundamental right, both because it is
religious exercise and because it is expression. *See*, *e.g.*, *Johnson v. Robison*, 415 U.S. 361, 375
n.14 (1974) ("Unquestionably, the free exercise of religion is a fundamental constitutional right.");
*Niemotko v. Maryland*, 340 U.S. 268, 272 (1951) (Equal Protection Clause barred the Government
from suppressing Jehovah's Witnesses from engaging in religious expression); *see also Harbin-
Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005) (both speech and religious freedom are
fundamental rights for Equal Protection purposes); *Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th
Cir. 2009) ("Fundamental rights include freedom of speech and religion."). Here, Plaintiffs seek
to exercise both their rights of expression and religious exercise. That is one of the two triggers for
strict scrutiny.

The other trigger is the application of a suspect classification. The Marine Corps' singling out
of Plaintiffs to their detriment, due to the religious motivation of their accommodation requests,

---

[23]   The principles of the Equal Protection Clause apply with equal force to the federal government
through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497
(1954).

also categorizes them on the basis of an inherently suspect class—religion. Discrimination on the basis of religious adherence "not only lacks a rational connection with any permissible legislative purpose, but is also inherently suspect. Such invidious discrimination violates the equal protection of the laws guaranteed by the Due Process Clause." *King's Garden, Inc. v. FCC*, 498 F.2d 51, 57 (D.C. Cir. 1974) (citing *Bolling*, 347 U.S. 497); *see also United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) ("The Equal Protection Clause prohibits selective enforcement 'based on an unjustifiable standard such as race, religion, or other arbitrary classification'").

Here, as explained above, the Marine Corps has discriminated on the basis of Plaintiffs' religion by refusing to extend to them the same kinds of exemptions from the grooming requirements that it extends to other Marines—a decision that reflects at least a "value judgment" that Plaintiffs' "religious motivations" are not as worth accommodating. *Cf. Fraternal Ord. of Police*, 170 F.3d at 366. For Aekash in particular, the extensive delay he has experienced and the inaccurate characterization of his religious beliefs as a "conscientious objector" contrast sharply with the treatment of his colleagues of other faiths or no faiths at all, who have long since begun their careers as Marines. For the reasons discussed in Sections I.C and I.D above, the Marine Corps cannot defend its regulations under strict scrutiny. Plaintiffs are likely to succeed on their claims.

## IV.  The remaining factors each weigh in favor of granting preliminary injunctive relief.

"In First Amendment cases, the likelihood of success 'will often be the determinative factor'" since preventing constitutional injuries tends to satisfy the other factors. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 691 (6th Cir. 2014) ("When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor."); *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 46 (RFRA protects First Amendment interests, such that showing likelihood of success on the merits of RFRA claim means the plaintiff "has shown that [he] will be irreparably injured absent injunctive relief").

**A.  Plaintiffs will suffer irreparable harm absent injunctive relief.**

Where, as here, a plaintiff faces unlawful coercion to abandon his religious beliefs or experiences discrimination based on those beliefs, this Circuit and Court have consistently recognized irreparable harm. This tracks the Supreme Court's rule that restrictions on religious exercise "cause irreparable harm" and that "'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Diocese of Brooklyn*, 141 S. Ct. at 67 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Rigdon*, 962 F. Supp. at 165 (holding that the violation of First Amendment religious expression rights constituted irreparable injury); *see also Simms v. District of Columbia.*, 872 F. Supp. 2d 90, 104 (D.D.C. 2012) (violation of Fifth Amendment rights constitutes irreparable harm); *cf. Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination."). The same is true for loss of RFRA protections. *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 45 (finding "the same is true of rights afforded under the RFRA"); *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 301 ("When plaintiffs establish a strong likelihood of success on the merits of their RFRA claim, they have also adequately demonstrated that they will suffer irreparable harm absent the issuance of a preliminary injunction." (cleaned up)).

Because Plaintiffs have demonstrated that their constitutional and civil rights are being violated, they have automatically established irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod*, 571 F.3d at 373). Facing a government directive to violate a teaching of one's faith is "a harm for which there can be no do over and no redress." *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 46 (quoting *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 302)).

The Marine Corps' undue delay and failure to accommodate Plaintiffs has harmed their lives and careers in a practical sense as well. All three Plaintiffs have put their lives and careers on hold,

and two have already waited over a year for the Marine Corps to process their requests, only to receive denials. On April 30, 2022, Jaskirat's Delayed Entry Program contract will expire, and without an accommodation, he will be administratively discharged and will have to start the enlistment process over again, absent relief from this Court. Compl. ¶¶ 63, 169. And unless this Court intervenes, in September 2022 and June 2023, Aekash and Chahal will both have to retake their entrance tests, which they already passed. Compl. ¶¶ 149, 205.

In addition, being subjected to blatantly discriminatory conditions constitutes irreparable harm. This Court faced a similar situation in *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164 (D.D.C. 2011). In that case, the disabled plaintiff sought an accommodation in taking the Multistate Bar Examination. Defendants "argue[d] that [the blind plaintiff] cannot show that she is likely to suffer irreparable harm because it is possible that she will pass the D.C. Bar Exam using either a human reader or an audio CD." *Id.* at 187. This Court rejected that argument, holding that "forcing Plaintiff to take the MBE under discriminatory conditions is itself a form of irreparable injury." *Id.*; *accord Singh*, 168 F. Supp. 3d at 233 ("[B]eing subjected to discrimination is by itself an irreparable harm.").

Under the governing regulations, Plaintiffs are fully entitled to religious accommodations and to receive one of the myriad individualized grooming exemptions that the Marine Corps provides to others. It is irreparable harm to force them to continue choosing between abandoning their religious beliefs and serving their country.

### B.  The balance of harms and public interest weigh in Plaintiffs' favor.

Plaintiffs likewise meet the combined balance-of-harms and public-interest factors. *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (explaining that these remaining factors "'merge when,' as here, 'the Government is the opposing party'" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Defendants will suffer no injury from a preliminary injunction allowing Plaintiffs to keep their requested beards and religious articles pending a final merits decision from this Court. As explained above, other branches of the military have allowed Sikh servicemembers to maintain their beards, unshorn hair, and religious articles without incident. And even if Defendants' abstract,

general interest in uniform appearances could be considered impaired by dress that is plainly religious in nature—a doubtful proposition—that interest has already given way where other forms of diverse expression or soldier-specific needs are at issue. Thus, the Marine Corps can demonstrate no harm to its interests stemming from accommodating Plaintiffs. In contrast, Plaintiffs have demonstrated that they will suffer irreparable and severe injury if made to choose between violating their faith and being denied military roles for which they have already proven themselves qualified.

As to public interest, enforcing an unconstitutional provision "is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). That is doubly so where unlawful religious discrimination is at issue. The Marine Corps' own regulations emphasize that "Service members have a right to observe the tenets of their religion." Compl. Ex. L; *see also* Compl. Ex. Y at ¶ 1.2(b) ("A Service member's expression of such [religious] beliefs may not, in so far as practicable, be used as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training, or assignment."). As previously explained, there is a "vital public interest in safeguarding religious freedoms protected by the Constitution and by statutes enacted by Congress." *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 47; *see also O Centro v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc), *aff'd*, 546 U.S. 418 (2006) ("[T]here is a strong public interest in the free exercise of religion."); *Tyndale House Publishers v. Sebelius*, 904 F. Supp. 2d 106, 130 (D.D.C. 2012) ("[T]here is undoubtedly also a public interest in ensuring that the rights secured under . . . RFRA, are protected.").

Outside this Court, the Marine Corps has made clear that servicemembers' diverse backgrounds and the expression of their identities is a help rather than a hindrance to good military order, even releasing a strategic plan for diversity, equity, and inclusion in July 2021.[24] As Defendant LtGen Ottignon recently explained, "[w]ithout having individuals with different

---

[24]   LtGen David Ottignon & BGen Jason Woodworth, *Diversity, Equity & Inclusion: Why This is Important to the Corps as a Warfighting Organization*, Marine Corps Gazette (July 2021), https://perma.cc/9S26-ZQDL.

backgrounds, we have the tendency to engage in 'group think.'"[25] He added that "the statistics demonstrate the needle is moving, but admittedly not quickly enough to meet the strategic objective of building a diverse force to meet a peer threat."[26] To seek out racial and ethnic diversity yet exclude religious diversity, particularly when Sikh servicemembers also identify as ethnically diverse, undercuts these asserted goals. *See also* National Defense Authorization Act for Fiscal Year 2020, H.R. 2500, 116th Cong. § 530B (2019) ("Any personnel policy developed or implemented by the Department of Defense with respect to members of the armed forces shall ensure equality of treatment and opportunity for all persons in the armed forces, without regard to . . . religion."). Accommodating Plaintiffs advances religious diversity and removes a significant barrier to entry for them and similarly situated Sikh Americans who aspire to serve their country as Marines without compromising their core religious beliefs. Accommodating Plaintiffs will also increase retention for them and other Sikh Americans in the military, because servicemembers who can practice their faith and freely express their religious identity are less likely to struggle with mental health issues and more likely to remain in the military.[27]

### V. The Court should not require security.

Plaintiffs request that the Court require no security. There is no prospect that Defendants would suffer damages even if it were later determined that they were wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c). Thus, the relevant "sum" required to preserve Defendants' interests is zero. *Id.* In addition, "only a party seeking to change (not maintain) the status quo needs to post a bond." *Laster v. District of Columbia*, 439 F. Supp. 2d 93, 99 n.7 (D.D.C. 2006). Plaintiffs are not seeking to "command the government to act," but rather "to *enjoin* the [Marine Corps] from enforcing its restrictions"—*i.e.*, to allow them to wear their religious articles as they would absent government

---

[25]   LtGen David Ottignon & BGen Jason Woodworth, *Diversity, Equity & Inclusion: Why This is Important to the Corps as a Warfighting Organization*, https://perma.cc/9S26-ZQDL.

[26]   *Id.*

[27]   Shareda Hosein, *Muslims in the U.S. Military: Moral Injury and Eroding Rights*, Pastoral Psychology, 68: 77-92 at 86, 89 (Nov. 12, 2018), https://perma.cc/LC9H-SFZP.

interference. *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 292 (emphasis added). Their request, therefore, does not necessitate bond.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully urge the Court to grant their application for a preliminary injunction directing the Marine Corps to grant them a full religious accommodation for the pendency of this lawsuit.

Plaintiffs also requests that the Court waive the posting of a bond.

Respectfully submitted this 13th day of April, 2022.

/s/ Eric S. Baxter
Eric S. Baxter (D.C. Bar No. 479221)
Daniel Blomberg (D.C. Bar No. 1032624)
Diana Verm Thomson (D.C. Bar No. 1811222)
Chris Pagliarella (D.C. Bar No. 273493)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketlaw.org*

Amandeep S. Sidhu (D.C. Bar No. 978142)
Winston & Strawn LLP
1901 L St., NW
Washington, DC, 20036-3506
(202) 282-5828 PHONE
(202) 282-5100 FAX
*asidhu@winston.com*

Amrith Kaur Aakre (Admission *pro hac vice* pending)
Giselle Klapper (Admission *pro hac vice* pending)
The Sikh Coalition
50 Broad St., Suite 504
New York City, New York 10004
(847) 786-5839 PHONE
*amrith@sikhcoalition.org*
*giselle@sikhcoalition.org*

*Counsel for All Plaintiffs*

40

Brian W. Song (Admission *pro hac vice* pending)
Matthew K. Cowherd (Admission *pro hac vice* pending)
Baker & Hostetler LLP
45 Rockefeller Plaza
New York City, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
*bsong@bakerlaw.com*
*mcowherd@bakerlaw.com*

*Counsel for Plaintiff Jaskirat Singh*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 13, 2022, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record. A copy of the foregoing was also served on counsel for Defendants by email.

/s/ Eric S. Baxter
Eric S. Baxter

*Counsel for Plaintiff*